**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CATHERINE E. SHOWELL,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY, et al.** | : | |
| **Defendant** | : | **No. 06-1574** |

**M E M O R A N D U M**

PRATTER, J.                                                                      JUNE 10, 2008

Catherine E. Showell, an African-American woman, initiated this race and gender

discrimination and retaliation action against her former employer, the Southeastern Pennsylvania

Transportation Authority ("SEPTA"), and Leslie Hickman, Ms. Showell's immediate SEPTA

supervisor.[1]  Ms. Showell asserts claims pursuant to Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e et seq., the Pennsylvania Human Relations Act ("PHRA"), 43

Pa. Cons. Stat. Ann. § 959 et seq., and 42 U.S.C. §§ 1981 and 1983.

After the parties conducted considerable discovery in the captioned case, SEPTA and Ms.

Hickman moved for summary judgment with respect to all of Ms. Showell's claims.  However,

in the interim, Ms. Showell commenced a second suit in federal court, which also was assigned

to this Court's docket.  In that second case, Ms. Showell sued SEPTA and Richard Hanratty,

another one of her superiors at SEPTA, alleging a one-count claim of retaliation in violation of

---

[1] When Ms. Showell initially brought this action she was still employed by SEPTA.
However, after she filed this action she initiated a second action against SEPTA and Richard
Hanratty, a member of SEPTA's management, alleging that she was terminated in retaliation for
filing the first law suit (among other acts of protected conduct) in violation of §§ 1981 and 1983.
The second action was assigned to this Court's docket, and was docketed at Civil Action No. 07-
2350.   SEPTA filed its motion for summary judgment before the Court consolidated the two
actions, and as such, its motion does not relate to the claims Ms. Showell's raised in the second
action.

42 U.S.C. §§ 1981 and 1983.

After the Court heard oral arguments on the defense motion in the initial case, in December 2007, while the defense motion was pending, the Court notified the parties that the Court intended to consolidate Ms. Showell's two lawsuits for all purposes, including trial, unless the parties objected in writing within 30 days. After receiving no objections from any party, the Court consolidated the two lawsuits under Civil Action No. 06-1574 for all pretrial and trial purposes.

Following consolidation, neither party has sought leave to supplement or otherwise amend their briefs in support of, or in opposition to, as the case may be, summary judgment in this matter. As a result, and the reasons set forth below, SEPTA's motion for summary judgment will be denied.

## JURISDICTION

The Court has jurisdiction over Ms. Showell's federal claims pursuant to 28 U.S.C. § 1331, and over Ms. Showell's state-law claims pursuant to 28 U.S.C. § 1367(a).

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed unless otherwise indicated.[2] Where there is a dispute,

---

[2] The Court's Pretrial and Trial Procedures require a party moving for summary judgment to provide a numbered paragraph-by-paragraph recitation of facts with specific citations to the record for the support of such facts. These procedures also require a party opposing summary judgment to state in similar paragraph form whether it agrees or disagrees that the facts as stated by the moving party are undisputed.

SEPTA followed the Court's procedures and provided a concise, paragraph-by-paragraph statement of facts with citations to the record. Ms. Showell then submitted a "Statement of Contested Material Facts" in opposition to the defense motion. At times, Ms. Showell's "Statement" serves the purpose for which this document is intended, i.e., as a response to the Defendants' statement of facts, as it either admits or denies the Defendants' assertions of fact, and precisely states Ms. Showell's contention with the fact as stated by the Defendants.

2

the facts are presented necessarily in the light most favorable to Ms. Showell.  See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 267 (3d Cir. 2001).

Ms. Showell, until recently, had been employed by SEPTA since 1984.  SEPTA is organized in several divisions.  Ms. Showell was employed in the Subway/Elevated Operations Division, which is a unit within the larger Rail Transportation Division.  (Def. Statement of Facts ¶ 17.)   Ms. Showell held the title of Director of Station Operations, supervising the cashier operations within the Subway/Elevated Operations Division.  (Def. Statement of Facts ¶¶ 1, 17.) SEPTA is an agency of the Commonwealth of Pennsylvania.  (Def. Statement of Facts ¶ 2; Pl. Statement of Facts ¶ 2.)

Leslie Hickman, a Caucasian woman, had been Ms. Showell's immediate supervisor to whom she reported directly since 2000.  (Def. Statement of Facts ¶ 4; Pl. Statement of Facts ¶ 4.) At all relevant times, Ms. Hickman was a Chief District Officer in SEPTA's Rail Transportation Division.  (Def. Statement of Facts ¶ 3; Pl. Statement of Facts ¶ 3.)

Ms. Showell became a "superintendent" in 1988, a title which is similar to "director," and became a Director of Station Operations in 1995.  (See Def. Mem. Ex. 9.)  In 2000, Ms. Showell was a grade 15 director.  (Def. Statement of Facts ¶ 8; Pl. Statement of Facts ¶ 7.)  In 2001, SEPTA converted its employees' pay grades to a new scale.  As a result, SEPTA claims that Ms.

---

However, by and large, Ms. Showell's "Statement" is not responsive to the Defendants' factual statement inasmuch as it constitutes a counter-statement of facts that merely asserts Ms. Showell's own versions of facts.  It neither corresponds to the Defendants' statement of facts, nor responds to Defendants' factual assertions.  Moreover, at times, Ms. Showell's nonlinear statement of facts is only tangentially related to the facts as stated by the Defendants. Nonetheless, in order to avoid further delay in addressing the motion or in the parties' orderly conduct of the litigation, the Court will not in this instance require Ms. Showell to revise her submissions to comply with the Court's standard procedures.

Showell became a grade 41 director in 2001.  (Def. Statement of Facts ¶ 8.)  Ms. Showell, on the other hand, contends that she became a grade 42 director in 2001.  (Pl. Statement of Facts ¶ 7.)  The parties agree that for each year between 2000 and 2006, Ms. Showell earned a salary within the guideline range recommended for her pay grade (regardless of whether she is considered a grade 41 or 42 director).  (Def. Statement of Facts ¶ 9; Pl. Statement of Facts ¶ 8.)

In determining its employees' salaries, SEPTA applies a "performance appraisal program," which is designed in order to compensate each employee based on his or her performance contributions.  (Def. Statement of Facts ¶ 10.)  Salary increases are based on meritorious performance, equity considerations and each individual employee's position in the guideline salary range.  (Def. Statement of Facts ¶ 11.)  SEPTA's salary guidelines are designed to enable supervisors to "pay for performance" within the limits set by SEPTA's salary increases.  (Def. Statement of Facts ¶ 11.)  The appraisal program utilizes a performance rating scale in which each employee being reviewed will receive a rating of either "exceeds expectations," "meets expectations," or "below expectations."  (Def. Statement of Facts ¶ 13.)

Ms. Showell was reviewed annually each year from 2000 through 2006.  (Def. Statement of Facts ¶ 14.)  In each of those years, except for 2004, Ms. Showell was given a rating of "meets expectations" and received a three percent merit-based salary increase.  (Def. Statement of Facts ¶ 14.)  In 2004, Ms. Showell also received a rating of "meets expectations" but in that year, instead of awarding merit-based salary increases, SEPTA awarded all directors who earned a rating of "meets expectations" or higher, including Ms. Showell, a one-time lump-sum payment of $1000.  (Def. Statement of Facts ¶ 14 & n.1.)  During each of these years, Ms. Hickman was responsible for evaluating and rating Ms. Showell's job performance.  (Def. Statement of Facts ¶

4

15.)

In March 2002, Ms. Showell filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") and simultaneously with the U.S. Equal Employment Opportunity Commission ("EEOC").  (See Def. Mem. Ex. 19.)  Her complaint contained four counts, consisting of allegations that she received unequal pay because of her gender and race, and that she was assigned insufficient support staff also due to her gender and race.  At that time, Ms. Showell averred that it "was brought to [her] attention that [she] was being paid less than [her] male counterpart."  (See Def. Mem. Ex. 19, PHRC Compl. ¶ 10.)  Ms. Showell alleged that SEPTA paid her $1,000 less in annual compensation than one director, Robert Allman, a Caucasian male, who held a different job title.  Ms. Showell also claimed that the department she supervised had an insufficient staff and that no other department headed by Caucasian males was similarly staffed.

Three years later, in March 2005, Ms. Showell filed an amended complaint with both the PHRC and the EEOC, adding three new counts to her original complaint.  (See Def. Mem. Ex. 20.)  She added claims of "harassment" based on her gender and race, respectively, claiming that she was the only African-American female director who was asked to relocate to her own office, and whose staff was required to address a two-year backlog of administrative work.  Ms. Showell also raised a new claim of "harassment based on retaliation," claiming that, in October 2003, after she filed her original PHRC/EEOC charge, she received a "poor" evaluation from Ms. Hickman.

On March 8, 2006, the EEOC submitted to Ms. Showell a notice of right to sue, informing her of her right to sue SEPTA in federal court within 90 days of her receipt of that

letter.  The next month, Ms. Showell initiated the instant action in federal court.  In her

Complaint, Ms. Showell asserted six counts, which essentially comprise allegations of race and

gender discrimination in violation of Title VII, 42 U.S.C. §§ 1981 and 1983 (race discrimination

only), and the PHRA (Counts 1-3), and retaliation in violation of Title VII, §§ 1981 and 1983

and the PHRA (Counts 4-6).  As noted above, in June 2007, Ms. Showell initiated a second

action, alleging that SEPTA and Mr. Hanratty retaliated against her on the basis of her race in

violation of §§ 1981 and 1983.

### SUMMARY JUDGMENT STANDARD

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment can be granted only if

the moving party persuades the district court that "there exists no genuine issue of material fact

that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843

F.2d 139, 143 (3d Cir. 1988).   An issue is "genuine" if a reasonable jury possibly could hold in

the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  A fact is "material" only if it could affect the result of the suit under governing

law.  Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most

favorable to the non-moving party," and make every reasonable inference in that party's favor.

Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all

reasonable inferences in favor of the non-moving party, the court determines that there is no

6

genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477

U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that

party's opposition with concrete evidence in the record.  Celotex, 477 U.S. at 322-23.  "If the

evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the

"underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it

is unnecessary and would only cause delay and expense."  Walden v. Saint Gobain Corp., 323 F.

Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573

(3d Cir. 1976)).

## DISCUSSION

In her opposition papers, Ms. Showell describes the claims she originally pleaded in her

Complaint as:  (1) "discriminatory compensation" on account of her race and/or gender in

violation of Title VII, 42 U.S.C. §§ 1981 and 1983 (on the basis of race only), and the PHRA; (2)

harassment and hostile work environment on account of her race in violation of Title VII, §§

1981 and 1983, and the PHRA; and (3) retaliation on account of her race and gender in violation

of Title VII, §§ 1981 and 1983 (on the basis of race only), and the PHRA.  (Pl. Mem. Opp'n 2.)

The Court will discuss Ms. Showell's claims, and Defendants' arguments with respect to

them, in turn.

## I.    MS. SHOWELL'S "DISCRIMINATORY COMPENSATION" CLAIM

Ms. Showell's "discriminatory compensation" claim is multifaceted, and has not yet been

fully or clearly articulated.  She appears to allege a "disparate treatment" claim, arguing that

7

SEPTA's management discriminates in the manner in which it compensates and evaluates employees, and determines annual merit increases, performance appraisals, work assignments, transfers, and promotions.  In addition, Ms. Showell argues that SEPTA's compensation policies have a "disparate impact" on African-American employees.

Defendants argue that Ms. Showell has not established a claim of wage discrimination for a number of reasons.  In addition, Defendants argue that Ms. Showell failed to raise her "disparate treatment" claim at the administrative level, and, consequently, that she is barred from raising this claim now.

### A.      Legal Framework for Analysis of Ms. Showell's Wage Discrimination Claims

Ms. Showell claims that SEPTA has discriminated against her with respect to her compensation on the basis of her race and gender in violation of Title VII, and the PHRA, and on the basis of her race in violation of §§ 1981 and 1983.  Discrimination claims under Title VII, the PHRA, and §§ 1981 and 1983 are all analyzed under the same legal standard.  See Jones v. School Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999).

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to discriminate "against any individual with respect to his [or her] compensation . . . because of such individual's race [or] . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Wage discrimination claims are analyzed by applying the burden-shifting framework the Supreme Court articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Briefly summarized, the McDonnell Douglas analysis proceeds in three stages.  First, the plaintiff must establish a prima facie case of discrimination.  Jones, 198 F.3d at 410.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate,

nondiscriminatory reason" for the employer's adverse action.  Id. (citing McDonnell Douglas, 411 U.S. at 801).  Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  Id.

To establish a prima facie case, Ms. Showell must offer sufficient evidence that she: (1) was a member of a protected class; (2) was qualified for the position at issue; (3) suffered an adverse employment action or decision with regard to a term or condition of employment, and (4) that similarly situated non-protected persons were treated more favorably.  Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1993); Dill v. Runyon, No. 96-3584, 1997 U.S. Dist. LEXIS 4355, at *9-10 (E.D. Pa. Apr. 3, 1997).  Defendants concede that Ms. Showell has met the first two requirements of a prima facie case of wage discrimination, namely, that Ms. Showell is an African-American woman, and was qualified for the position of "director" that she held.  (Def. Mem. 5.)  Defendants argue, however, that Mr. Showell cannot satisfy the remaining elements of a prima facie case, and refute Ms. Showell's contention that she was paid at a lower rate than similarly situated non-protected class employees.  Specifically, Defendants claim that Ms. Showell does not present sufficient "comparators," that she is compensated within the pay range established for her grade, that she has received annual merit increases within the recommended range, and that there are no statistically significant differences in pay between African-American and Caucasian directors, and between male and female directors.

**B.     Ms. Showell's "Disparate Treatment" Claims**

In order to establish a case of unequal pay, Ms. Showell must demonstrate that she performed work substantially equal to that of "similarly situated" non-protected persons, i.e.,

"comparators," who were compensated at a higher rate than she was.  Aman v. Cort Furniture
Rental Corp., 85 F.3d 1074, 1087 (3d Cir. 1996) (citing Hohe v. Midland Corp., 613 F. Supp.
210, 214 (E.D. Mo. 1985), aff'd without op., 786 F.2d 1172 (8th Cir. 1986); Dill, 1997 U.S. Dist.
LEXIS 4355, at *9-10.  In the unequal pay context, a "similarly situated" employee with whom a
plaintiff seeks to be compared must "'have engaged in the same conduct without such
differentiating or mitigating circumstances that would distinguish their conduct or the employer's
treatment of them for it.'"  Dill, 1997 U.S. Dist. LEXIS 4355, at *12 (quoting Anderson v.
Haverford Coll., 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting Mitchell v. Toledo Hosp., 964
F.2d 577, 583 (6th Cir. 1992))).  Further, "the proposed analogues must be similarly situated in
all 'material respects.'"  Id. (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751
(1st Cir. 1996)).

Ms. Showell compares herself to the following individuals, all of whom are Caucasian
males: John Cottingham, Larry Smith, Robert Allman,[3] Michael Kolesnik, and Robert Smithers.
(Pl. Statement of Facts ¶ 16.).[4]  It is undisputed that while all five of these individuals are
"directors" at SEPTA, only Mr. Smith (who resigned from SEPTA in 2005) shared the same title
and comparable responsibilities as Ms. Showell.[5]  SEPTA argues that directors with different

---

[3] In her initial complaint filed with the PHRC, Ms. Showell cited the salary disparity
between her and Mr. Allman as evidence of discrimination.  At the time, Ms. Showell averred
that she received an annual salary of $77,000, while Mr. Allman's salary was $78,000.  (Def.
Mem. Ex. 19 ¶¶ 12-13.)

[4] In addition, Defendants aver that in Ms. Showell's answers to SEPTA's interrogatories,
she compared herself to John (Jack) Lauser and Anthony Alessandrine, both of whom are
Caucasian males.  (Def. Statement of Facts ¶ 19.)

[5] It also appears that Mr. Alessandrine and Ms. Showell shared the same title and
responsibilities.  Mr. Alessandrine did not become a director until approximately 2006.

titles and different responsibilities cannot be compared to Ms. Showell for purposes of analyzing

her wage discrimination claim because different variables account for the admitted differences in

salary.[6]  Furthermore, SEPTA argues that a review of the salaries paid from 2000-2006 reveals

that Ms. Showell's compensation is in the middle of these comparators' salaries.  She was paid

less than Cottingham, Allman and Smithers from 2000-2006, but paid more than Smith and

Kolesnik.  However, Smith's salary's overtook Ms. Showell's salary in 2003, and he earned more

than she did in 2003-2006.[7]  In addition, Ms. Showell consistently received a 3% annual merit

increase while other directors consistently received higher annual salary increases.[8]

     In response, Ms. Showell argues that other directors received salaries increases at a higher

rate than she did, despite their records of substandard performance, and despite the fact that she

supervised more employees.  In that regard, Ms. Showell states that Mr. Lauser violated SEPTA

---

     Mr. Cottingham was the Director of Railroad Services – Rail Transportation - Railroad Services; Mr. Lauser was the Director of Transportation - Construction Coordinator – Rail Transportation – Construction; Mr. Allman was the Director of Transportation - Q/C Policy Enforcement – Rail Transportation; and Mr. Kolesnik was the Director of Transportation - Rail Transportation – Subway/Elevated.  It is unclear what title Mr. Smithers held.

     [6] Plaintiff states that "[c]lear evidence has been provided that Plaintiff's position is substantially equal to those of other employees with the title of Director at SEPTA, regardless of whether it is a Director in the Subway/Elevated, Rail Services or Bus Services sub-division," noting that the job description postings are substantially the same.  (Pl. Mem. Opp'n 70.) However, these job descriptions are substantially outdated, each from 1995 and 2000, respectively.  (See Pl. Mem. Exs. 44, 149.)  Other than aged job descriptions, Plaintiff has not offered any evidence that these jobs or directorships are sufficiently similar.

     [7] Ms. Showell received a higher salary than Mr. Lauser from 2000-2006, and received a higher salary than Mr. Alessandrine in 2006, his first year as a director.

     [8] Mr. Smith received merit increases of 3.5%, 5%, 3.5%, and 4.5% in 2000-2003, respectively; Mr. Lauser received merit increases of 4%, 3.5.%, 4% and 4.6% in 2000-2003, respectively; and Mr. Kolesnik received merit increases of 3%, 4%, and 4.6% in 2000, 2002 and 2003, respectively.

rules but did not receive a written warning, and when comparator directors were given

"additional tasks," their salaries were increased under SEPTA's "special compensation" policy

while she was not extended the same beneficial treatment.  For example, Ms. Showell alleges

that in 2002 Mr. Smith left a two-year backlog of administrative work, a burden that Ms. Showell

assumed, yet she claims she was not adequately compensated for this additional burden and was

not provided adequate staff to handle the workload.  Plaintiff puts substantial emphasis on the

fact that she supervised 292-374 employees, while her comparator directors supervised

substantially fewer people.[9]

Based on figures provided by the Defendants, which Ms. Showell has not refuted, Ms.

Showell was paid more than some Causasian male directors and less than others from 2000 to

2006, and other African-American directors were paid more than some Causasian directors and

less than others.  (See Def. Statement of Facts ¶¶ 41-47.)  There are many more white directors

than African-American directors and many more males than females in the director ranks.[10]  In

any given year from 2000 to 2006, the top four to seven highest paid directors were Caucasian

males.

In addition, as noted above, Ms. Showell points to the fact that the Caucasian male

directors received higher annual merit increases than she did despite these directors' allegedly

sub-par performances.  Although Ms. Showell received annual ratings of "meets expectations,"

and regularly received a three percent salary increase as a result of her annual performance

---

[9] According to Ms. Showell, each of her comparator directors supervised the following number of employees:  Cottingham, 16, Smithers, 8, Allman, 93, Smith, 261, Lauser, 0.

[10] Ms. Showell is one of two female directors according to the information provided by Defendants.

evaluation, she argues that other directors, such as Messrs. Smith, Lauser and Alessandrine received higher merit increases in some years.  Specifically, Mr. Smith received increases of 3.5%, 4%, 4.5% and 5% in some years even though, Ms. Showell alleges, his performance was poor.  Essentially, Ms. Showell argues that SEPTA applies its appraisal programs, and awards its merit increases, in a discriminatory manner such that Caucasian male directors are rewarded for poor performance, while she (and other African-American directors) are "kept down" because they are awarded only middle-of-the-road ratings and merit increases.

After reviewing the record evidence submitted by the parties, and the parties' lengthy briefs, and after the benefit of presiding over oral arguments on the defense motion, it is clear to the Court that disputes of material facts remain with respect to grade levels, job titles, responsibilities, and performance, just to name a few issues, which preclude summary judgment on this claim at this time.  Based on the record provided by the parties, it is impossible to draw any conclusions as to why some directors are paid more than others.  Specifically, it is impossible to determine from the record as it has been presented why Ms. Showell was paid less than certain Caucasian male directors.  Both parties have submitted many hundreds, if not thousands, of pages of exhibits, which, they maintain, support their arguments.  However, the parties have not presented this evidence in an organized, coherent manner which would enable the Court to draw any conclusions, for or against either of their respective contentions.

As an initial matter, all of the directors with whom Ms. Showell compares herself are Grade 42 directors.  Ms. Showell insists that she also is a Grade 42 director, and she refers to several documents in the record produced by SETPA that list her as a Grade 42 director.  However, SEPTA argues that Ms. Showell is a Grade 41 director, and has produced various

13

documentation that attests to this fact.  Accordingly, SEPTA argues that Ms. Showell has not

established sufficient comparators.  SEPTA argues that assuming, arguendo, that Ms. Showell is

a Grade 42 director, there is no statistically significant difference between the compensation of

African-American directors versus Caucasian directors, and that a review of the compensation

records does not indicate a pattern of race or gender based discrimination.  Defendants produced

salary tables indicating that Ms. Showell's compensation essentially falls in the middle of a long

list of directors, including African-Americans, Caucasians, men and women, and including

numerous directors in addition to the "comparators" discussed above.  However, this data is not

ultimately helpful absent supporting facts – such as job title, responsibility, seniority, etc.,

relative to Ms. Showell – few of which have been explained, let alone established.  Whether or

not Ms. Showell is a grade 41 or 42 director, however, the record is clear that she holds a title

and position that is different in many significant respects than her "comparator" directors.

Indeed, Ms. Showell may face a unsurmountable hurdle at some point down the litigation road in

establishing that her "comparator" directors are "similarly situated," as will be required by the

governing precedents.

There are also numerous disputes of fact about Ms. Showell's job responsibilities and the

responsibilities of her comparator directors.  Ms. Showell argues that SEPTA's summary

description of her job responsibilities is inaccurate, and that she is required to perform many

more tasks than for which SEPTA's job description has given her credit.  SEPTA has not sought

to explain any of these issues.  In addition, Ms. Showell claims that SEPTA, and Ms. Hickman in

particular, routinely asked her to perform additional tasks, i.e., tasks that would not normally fit

within her routine job responsibilities, but that SEPTA failed to adequately compensate her for

these responsibilities.  She notes that other directors, including Mr. Allman, have been

compensated for completing "special assignments."

Moreover, assuming for the sake of argument that Ms. Showell had established a prima

facie case, such that the burden should shift back to SEPTA to articulate a legitimate non-

discriminatory reason for its action, SETPA has failed to do so.  In its briefs, SEPTA merely

states that its salary decisions are the product of multiple factors, including (1) salary grade, (2)

location in the salary range, (3) employee's starting salary, (4) annual merit increases, (5)

relationship to subordinates' salaries, (6) relationship to supervisors' salaries, (7) relationship to

peers' salaries, (8) equity considerations, (9) salaries of present employees in related positions,

and (10) promotional history.  (Def. Mem. 14.)  In its brief, SEPTA refers the Court to SEPTA's

compensation policies, which provide that SEPTA management may consider certain of these

factors in determining employee compensation.  However, SEPTA has only argued that these

factors may affect employees' salaries, and they have highlighted certain comparator employees'

experience, tenure at certain positions, etc., in an effort to explain why certain salary disparities

exist in this case.  SEPTA has not established or produced any evidence, through testimony of

the SEPTA employees who made the decisions with respect to Ms. Showell's compensation or

otherwise, that SEPTA actually considered these factors when setting or adjusting Ms. Showell's

salary or the salaries of her comparators.  At the summary judgment phase, these genuine

disputes of fact underlying how SEPTA's compensation decisions are made preclude entry of

summary judgment at this time.

### C.     Ms. Showell's "Disparate Impact" Claims

First, SEPTA argues that Ms. Showell failed to bring a "disparate impact" claim when

she filed her initial charge or her amended charge with the PHRC.  Accordingly, SEPTA argues, Ms. Showell is barred from bring that claim here.  Secondly, SEPTA argues that her "disparate impact" claim fails on the merits.

Discriminatory compensation claims typically are raised under two different theories: a disparate "treatment" theory, which is discussed above, and a disparate "impact" theory.  "A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer." EEOC v. Metal Serv. Co., 892 F.2d 341, 346 (3d Cir. 1990).  No proof of intentional discrimination is necessary to prevail under this theory.  Id. at 346-47.  Stated simply, to establish a prima facie case of disparate impact discrimination, a plaintiff  must show "(1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class." Pacheco v. Mineta, 448 F.3d 783, 791 (5th Cir. 2006) (dismissing plaintiff's disparate "impact" claim because administrative charges facially alleged disparate treatment, did not identify a neutral policy and all of the factual allegations related to past incidents of disparate treatment).

### 1.    Whether Ms. Showell's Disparate "Impact" Claim Is Barred

Defendants argue that Ms. Showell failed to exhaust her administrative remedies with respect to her "disparate impact" claim because she failed to allege disparate impact or identify a neutral employment policy in her PHRC complaint or amended complaint.   Accordingly, Defendants argue that Ms. Showell is barred from bringing that claim now.

An individual wishing to challenge an employment practice under Title VII and the PHRA must first file a charge with the EEOC or the PHRC, respectively.  See § 2000e-5(e)(1).

If a plaintiff fails to file a timely complaint with the EEOC or PHRC, then he or she is precluded from judicial remedies under Title VII and the PHRA, respectively.  Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997).  The Court of Appeals for the Third Circuit has stated that the "relevant test in determining whether [a claimant is] required to exhaust her administrative remedies . . . is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom."  Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).

Neither of Ms. Showell's administrative complaints used the term "disparate impact" or described a "facially neutral policy" in those terms.  Both complaints merely state that Ms. Showell is paid less than one other SEPTA employee, a white male, who performs the same job as Ms. Showell.  Defendant argues that Ms. Showell's PHRC complaints "are based solely on allegations that she has been singled out for intentional discrimination based on her gender and race," which Defendants characterize as "disparate treatment" allegations.  (Def. Mem. Summ. J. 17.)  However, although both of Ms. Showell's administrative complaints allege that the pay disparity is the result of discrimination, neither complaint explicitly states whether such discrimination was intentional or was the result of the application of a neutral employment practice that caused an adverse impact on a protected class.  A fair reading of Ms. Showell's administrative complaint indicates that she could have been alleging either a "disparate treatment" claim or a "disparate impact" claim, or both.

Defendants also argue that Ms. Showell has not produced any evidence that the PHRC's investigation included her disparate treatment claims, and summarily conclude that the investigation "focused solely on Plaintiff's disparate treatment claims."  (Def. Mem. Summ. J.

17

17.)  However, Defendants do not refer the Court to any evidence in the record to support this conclusion, nor do they point to any details of the PHRC's investigation that support their claim.

In support of her position, on the other hand, Ms. Showell offers several examples of correspondence between SEPTA's counsel and the PHRC related to the PHRC's investigation of her claims, in addition to the claims of other African-American directors who sued SEPTA charging pay disparities, during the same general time frame in which Ms. Showell initiated the instant law suit.  (See Cert. O. Abiona, Exs. 4-10, 12-13.)  This correspondence indicates that the PHRC conducted a consolidated, or at least a contemporaneous, investigation of salary discrimination claims brought by at least six different African-American employees, including Ms. Showell, against SEPTA at once.  All of the correspondence is in the nature of PHRC's requests for information, and SEPTA's counsel's responses to those requests.  As part of this investigation, the PHRC requested copies of records showing the salary histories for dozens of SEPTA employees (i.e., those of complainants and potential comparators).  In response to the PHRC's request, SEPTA's counsel produced spreadsheets detailing the salary histories of over 50 SEPTA employees.  (See Cert. O. Abiona, Ex. 12.)  In one letter, the PHRC asked SEPTA's counsel to explain the salary discrepancies between several employees, some of whom were African-American (both males and females) and some of whom were Caucasian (both males and females).  (See Cert. O. Abiona, Ex. 10.)

None of the correspondence produced clearly indicates whether the PHRC investigated Ms. Showell's (and the rest of the claimants') allegations as exclusively comprising disparate "impact" or "treatment" claims.  However, a reasonable inference is that PHRC was pursuing, or at least leaving open, both possibilities.  For example, based on the nature of the PHRC's

requests for information, it would not be unreasonable to conclude that the PHRC intended to compile statistical evidence to demonstrate whether SEPTA's compensation structure was implemented in a manner that caused a disparate impact upon a protected class of employees, namely, African-American directors.  In light of these documents produced by Ms. Showell, and the lack of evidence and argument offered by Defendants in support of their argument on this point, the Court is satisfied that the acts alleged in Ms. Showell's current Complaint fairly fall within the scope of the PHRC's investigation that arose from her administrative complaints. Accordingly, Ms. Showell's "disparate impact" claims are not barred.

2.     The Merits of Ms. Showell's Disparate "Impact" Claim

Defendants also argue that Ms. Showell's disparate impact claim must fail on the merits. In particular, Defendants argue that (1) Ms. Showell has failed to establish a prima facie case because she does not identify a particular employment practice that creates a disparity in SEPTA's directors' salaries; (2) Ms. Showell has produced insufficient statistical evidence to support her disparate impact claim; (3) SEPTA's compensation policy is job related and consistent with business necessity; and (4) Ms. Showell has not presented an alternative employment practice that has a less discriminatory impact.

Plaintiff did not address the merits of her discriminatory impact claim in her brief, except to state, without providing any legal or factual support, that she has adduced sufficient evidence to permit a jury to decide whether SEPTA's compensation policies have a disparate impact on African-American individuals or women, and, in particular, on Ms. Showell.

After considering SEPTA's arguments, which were ably presented, the Court determines that the contours of any potential "disparate impact" claim Ms. Showell may have presented are

unclear.  It is incumbent upon Ms. Showell to articulate her "disparate impact" claim in a more direct fashion, for example, by way of a pretrial memorandum, as this case progresses towards a trial.  In particular, Ms. Showell must indicate precisely which neutral employment policy or policies she claims creates a disparate impact.  In this case, Ms. Showell has referred to SEPTA's "SAM Compensation Policy," "vertical equity" policies, and "appraisal" policies, but she has not explained precisely how these policies have a disparate impact upon African-American (or female) directors.  In addition, Ms. Showell has not supported her claim by credible statistical evidence.[11]  Finally, if SEPTA meets its burden to show that its neutral policies are job related and consistent with business necessity, Ms. Showell would need to show that an alternative employment practice has a less discriminatory impact while also satisfying SEPTA's legitimate business impact.

As it currently stands, Ms. Showell's "wage discrimination" claims appear to boil down to her assertion that she, as well as other African-American employees at SEPTA, are <u>treated</u> unfairly, i.e., are treated less favorably than Caucasian male employees.  She emphasizes that Ms. Hickman singled her out for mistreatment, continually assigning her undesirable work, while refusing to increase her pay.  Ms. Showell eventually will have to explain how these allegations, which largely focus on disparate treatment – indeed, intentional infliction of disparate treatment – constitute a "disparate impact" claim.  If Ms. Showell fails to do so, SEPTA may file a further

_____

[11] The Court acknowledges that Ms. Showell submitted an expert report of Charles H. Fay as part of the record in this case.  However, Dr. Fay's report does not mention any specific neutral compensation policy by name.  Rather, it appears that Dr. Fay examined certain directors' salaries and race.  Moreover, with respect to Ms. Showell, Dr. Fay stated the following: "Ms. Showell has a uniquely titled job, so an analysis of differences from other identically titled job incumbents is not possible.  However, adverse impact analyses show statistically significant unfavorable wage differences for blacks in Grade 42."

dispositive motion at that time.

### III.    Ms. Showell's Harassment and Hostile Work Environment Claims

Ms. Showell argues that her Complaint includes claims of harassment and hostile work environment on the basis of her race and gender under Title VII and the PHRA, and on the basis of her race under §§ 1981 and 1983.  Although Ms. Showell's Complaint does not allege either "harassment" or "hostile work environment" as a separate count or cause of action, Ms. Showell's Complaint arguably  has stated a "hostile work environment" discrimination claim. She alleges that the way work is assigned at SEPTA created a "hostile work environment" (Compl. ¶ 14), and that she "was constantly harassed and humiliated by Defendant Hickman because of her race and gender."  (Compl. ¶ 22.)

In order to prevail on a hostile environment claim, Ms. Showell must prove five elements: that (1) she suffered intentional discrimination because of her race or gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.  Jensen, 435 F.3d at 449.  The Supreme Court has cautioned that a court must look at the totality of the circumstances when judging whether a work environment is hostile.  Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).  The Third Circuit Court of Appeals has adopted this approach, noting that "courts should not consider each incident of harassment in isolation.  Rather, a court must evaluate the sum total of abuse over time."  Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999) (citations omitted).  For this reason, a plaintiff's claim will survive summary judgment if the plaintiff "presents sufficient evidence to give rise to an inference of discrimination by offering proof that her workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and the conduct is based on one of the categories protected under Title VII."  Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 279 (3d Cir. 2001) (citing Harris, 510 U.S. at 21).

As an initial matter, the Court notes that Ms. Showell has not offered any direct evidence of discriminatory harassment grounded in any race- or gender-related animus.  In other words, she has not presented any evidence that anyone at SEPTA, including Ms. Hickman, used any insensitive language, epithets, or insinuations, or made any remarks whatsoever, let alone any negative remarks, that specifically referred to her race or gender.  Moreover, she candidly admitted that Ms. Hickman has never used any racial slurs or epithets when speaking with her, and that she never heard Ms. Hickman use any racial slurs or epithets with other African-American employees at SEPTA.  (C. Showell Dep., 112:11-23.)

Instead, Ms. Showell offers circumstantial evidence from which she asks the Court to infer that, because she was (and other African-American employees were) singled out for mistreatment, such mistreatment must have been due to her race and/or gender.  Ms. Showell argues that because Ms. Hickman does not treat Caucasion male employees in this manner, or, stated differently, because Ms. Hickman allegedly only mistreats African-American employees in this manner, Ms. Hickman must have mistreated Ms. Showell because of her race and/or gender.  (See Pl. Mem. Opp'n 14 ("Hickman only addressed the black Directors in such rude and derogatory manner."))  In her deposition, Ms. Showell stated that it became Ms. Hickman's "norm" to address her, along with Crystal Griggs and Darryl Wade, two other African-American SEPTA employees, using a "caustic, condescending tone."  (Def. Mot. Ex. A, Jan. 30, 2007 C.

22

Showell Dep. Tr. 109:6-7, 11-12, 16-17.)   In particular, Ms. Showell claims that Ms. Hickman, her direct supervisor, "excessive[ly] monitor[ed]" Ms. Showell's department, but did not excessively monitor the departments headed by Caucasian males, that Ms. Hickman made "caustic, condescending" remarks to Ms. Showell, "belittled and badgered" her using a "condescending, demeaning" tone, and she came "barreling" down the hallway while "pointing and berating" Ms. Showell.  (Def. Mot. Ex. A, Jan. 30, 2007 C. Showell Dep. Tr. 100:6-7, 11-12, 16-17; 102:16-103:4.)

   In addition to Ms. Hickman's alleged abusive behavior towards her, Ms. Showell argues that Ms. Hickman's manner of assigning work to her versus other directors, and her assignment of staff, among other issues, created a hostile work environment.  For example, Ms. Showell claims that Ms. Hickman directed Ms. Showell to move all of her operations to a new location; she claims that only she and two other African-American directors were told to relocate.  Ms. Showell also alleges that Ms. Hickman directed her to complete a two-year backlog of administrative work left by Larry Smith, another director.  Ms. Showell alleges that Ms. Hickman intentionally chose to "dump" this work on her, while no other directors had to assist her or shoulder part of the load.  Moreover, Ms. Showell claims that Ms. Hickman harassed her regarding the status of the uncompleted backlog of work, consistently asking her why she had not completed it yet, and demanding that she do so.  In addition, Ms. Showell states that as Ms. Hickman piled on more and more administrative work, she refused, despite Ms. Showell's requests, to provide her with additional staff to assist with ministerial tasks.  Ms. Showell claims that in singling her out for discriminatory mistreatment, Ms. Hickman "set [her] up to fail."  (Pl. Resp. 16.)  In addition, Ms. Hickman required Ms. Showell and her staff to respond to

emergencies, including a potential bomb threat, while other directors - including directors who would have been more appropriately assigned to shoulder these tasks - were not asked to respond.

The Court notes that Defendants addressed Ms. Showell's "hostile work environment" allegations only with respect to her retaliation claim, which is discussed below.  In the retaliation context, Defendants argue that the minimal examples of "hostile" behavior that Ms. Showell claims to have suffered are neither "severe" nor "pervasive."  For example, Ms. Showell states that Ms. Hickman "berated" and "humiliated" her.  However, Defendants argue, Ms. Showell does not provide any details as to when or how often such incidents occurred, or what exactly was said or done during these encounters.

On balance, the Court concludes, as with Ms. Showell's wage compensation claims, that disputes of facts exist that serve to preclude summary judgment on her hostile work environment claim.  In this case, the record contains evidence of harassment that a jury might well find to be severe or pervasive.  Ms. Showell has described a pattern of discriminatory behavior beginning no later than 2000, in which Ms. Hickman singled her out for additional administrative work, forced her to relocate to an undesirable locations (while Caucasian employees where not required to relocate), gave her undesirable assignments, and assigned her insufficient staff.  In addition, Ms. Showell has described a pattern of abusive behavior, which she claims was the "norm" in the office setting, where Ms. Hickman would address her with a rude, condescending tone, yell at her, and berate her in front of other staff.  In short, Ms. Showell has adduced evidence from which a reasonable jury could conclude that Ms. Hickman was abusive and "set her up to fail."  Certainly, Ms. Showell claims that Ms. Hickman's behavior detrimentally affected her, and a jury

24

could reasonably conclude that this behavior would have detrimentally affected a reasonable

person in like circumstances.  Finally, a basis for employer liability is present here because Ms.

Hickman was Ms. Showell's supervisor.  See Jensen, 435 F.3d at 452 ("If supervisors create the

hostile environment, the employer is strictly liable, though an affirmative defense may be

available where there is no tangible employment action.") (citing Burlington Indus., Inc. v.

Ellerth, 524 U.S. 742, 765 (1998)).

## IV.   Ms. Showell's Retaliation Claim

As stated above, Title VII forbids employment discrimination against "any individual"

based on that individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Title VII also contains a separate anti-retaliation provision that forbids an employer from

"discriminat[ing] against" an employee or job applicant because that individual "opposed any

practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a

Title VII proceeding or investigation. § 2000e-3(a); see Burlington N. & Santa Fe Ry. v. White,

548 U.S. 53, 56 (2006).

To establish a prima facie case of retaliation under Title VII, Ms. Showell must show that

(1) she engaged in protected activity, (2) SEPTA took a "materially adverse" action against her,

and (3) there was a causal connection between Ms. Showell's protected activity and SEPTA's

action.  See Moore v. City of Phila., 461 F.3d 331, 341-42 (3d Cir. 2006).  If Ms. Showell

establishes this prima facie case of retaliation, the McDonnell Douglas burden-shifting approach,

described above, applies and the burden of production shifts to SEPTA to articulate a legitimate,

nondiscriminatory reason for its action.  See McDonnell Douglas, 411 U.S. at 802.  Once SEPTA

meets this relatively light burden, the burden of production returns to Ms. Showell, who must

show by a preponderance of the evidence that SEPTA's proffered reason is pretextual.  See id. at 804-05.

Although Ms. Showell asserts retaliation claims under both Title VII and the PHRA, the prohibitions are equivalent and the analysis is the same.  Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006); Pollard v. George S. Coyne Chem. Co., N0. 07-3744, 2008 U.S. Dist. LEXIS 40478, at *21 n.20 (E.D. Pa. May 19, 2008).  With respect to Ms. Showell's retaliation claim under Section 1983, the analysis differs slightly.  To prevail on a First Amendment Section 1983 retaliation claim, Ms. Showell must establish that (1) she engaged in protected speech, (2) her interest in the protected speech outweighs the employer's countervailing interest in promoting the efficiency of the public service it provides to its employees, and (3) the protected activity was a substantial or motivating factor in the alleged retaliatory action. Baldassare v. New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001); Zappan v. Pa. Bd. of Prob. & Parole, 152 Fed. App'x 211, 217 (3d Cir. 2005) (non-precedential).  SEPTA can rebut the claim by demonstrating it would have reached the same decision even in the absence of the protected conduct.  Baldassare, 250 F.3d at 195; Zappan, 152 Fed. App'x at 217.

The Supreme Court defined "materially adverse" in this context to mean "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68 (citations and internal quotation marks omitted); Moore, 461 F.3d at 341.  Material adversity is "important to separate significant from trivial harms," Burlington, 548 U.S. at 68, because, as the Supreme Court has stated, "Title VII . . . does not set forth 'a general civility code for the American workplace.'"  Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  Stated differently, a plaintiff may meet her burden by

demonstrating that her employer's conduct is "likely to deter victims of discrimination from complaining to the EEOC." Id. (internal quotation and citation marks omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" normally are not sufficient to deter a reasonable person. Id.

Whether an action is materially adverse will often depend "'on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" Id. at 69 (quoting Oncale, 523 U.S. at 81-82). However, the Supreme Court has stated that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." Id. Similarly, ordering an employee to do work assignments that are "more arduous and dirtier" may constitute "materially adverse" action. Id. at 71.

With respect to the causation prong, the standard in this circuit is whether a reasonable jury could link the employer's conduct to retaliatory animus. See Jensen, 435 F.3d at 449 n.2 (explaining "[t]he ultimate question in any retaliation case is an intent to retaliate vel non"). In assessing this, the focus has often been on two factors: (1) the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and (2) "the existence of a pattern of antagonism in the intervening period." Id. at 450 (quotations and citations omitted). However, "each case must be considered with a careful eye to the specific facts and circumstances encountered." Hare v. Potter, 220 Fed. App'x 120 (3d Cir. 2007) (non-precedential) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n.5 (3d Cir. 2000)); see also Burlington, 548 U.S. at 69.

For the purposes of summary judgment, Defendants concede that Ms. Showell engaged in two instances of protected conduct: (1) on March 11, 2002, she filed a complaint against SEPTA with the PHRC alleging wage discrimination; and (2) on March 8, 2005, Plaintiff filed an amended complaint with the PHRC alleging wage discrimination, harassment and retaliation. (Def. Mem. 27.)  In addition, Ms. Showell filed the instant lawsuit in federal court and in the second lawsuit she filed, she alleges that SEPTA retaliated against her after she filed the first lawsuit, as well as for supporting lawsuits that had been filed by other African-American directors at SEPTA.

Defendants argue that Ms. Showell has failed to satisfy the remaining prongs of the prevailing test for retaliation in that she did not suffer a "materially adverse" employment action, and assuming arguendo that she did, that there is no causal connection between the protected activity and any such action.  Accordingly, Defendants argue, Ms. Showell has failed to establish a claim for retaliation.

However, the Court will not consider Defendants' arguments regarding Ms. Showell's retaliation claim because Ms. Showell's claim that she was terminated in retaliation for filing her initial federal court lawsuit, which she raises in her Complaint in the second federal action she filed, has not been briefed and is not ripe for summary judgment at this time.  Defendants argue, as noted above, that Ms. Showell has not established that SEPTA took an "adverse action" against her.  However, the fact that she was terminated, as she alleges, following her initiation of the first lawsuit, likely may affect SEPTA's argument and Ms. Showell's burden.  Rather than address Ms. Showell's retaliation claims piecemeal, the Court will wait until these claims are fully briefed and argued, if the parties choose to address this claim in a pre-trial setting.

28

**V.      Punitive Damages against Ms. Hickman**

Finally, Defendants argue that Ms. Showell is not entitled to punitive damages.  Punitive

damages are not available under the PHRA.  See Hoy v. Angelone, 456 Pa. Super. 596, 691 A.2d

476, 483 (Pa. Super. Ct. 1997), affirmed, 554 Pa. 134, 146 (Pa. 1998) ("In the absence of express

statutory language or any further legislative guidance, we hold that punitive damages are not

available under the [PHRA].");  Snyder v. Bazargani, Nos. 06-2396, 05-4051, No. 05-3817, 2007

U.S. App. LEXIS 14990, at *7 n.1 (3d Cir. June 22, 2007) (unpublished);  Gagliardo v.

Connaught Labs., 311 F.3d 565, 570 n.3 (3d Cir. 2002).  However, punitive damages are

available in an action under Title VII to redress unlawful intentional discrimination, which

excludes "an employment practice that is unlawful because of its disparate impact."  See 42

U.S.C. § 1981a(a)(1).  Punitive damages are not available against municipalities or other arms of

a state, which would include SEPTA for violations of Section 1983.  Russoli v. Salisbury Twp.,

126 F. Supp. 2d 821, 873 (E.D. Pa. 2000).  However, punitive damages are available against

individual state actors under Section 1983 upon a showing that the conduct was "motivated by

evil motive or intent, or when it involves reckless or callous indifference to the federally

protected rights of others."  Id. (citing  Smith v. Wade, 461 U.S. 30, 56 (1983).

Defendants cite case law only with respect to Ms. Showell's claims under Sections 1981

and 1983, arguing that Ms. Hickman's behavior does not rise to the level of "evil," "reckless" or

"callous."  Plaintiff's response cites no helpful case law, and simply asserts that a jury could find

that Ms. Hickman's behavior toward Ms. Showell displayed a reckless indifference to her right to

be free from race discrimination.  (Pl. Mem. Opp'n 88.)  Thus, it appears that the issue of

punitive damages depends upon what issues, if any, advance to trial.  Because the Court has

concluded that all of Ms. Showell's claims are sufficient to survive summary judgment, at least at this time, the Court will reserve judgment on Defendants' arguments with respect to punitive damages.

**CONCLUSION**

For the reasons provided above, Defendants' Motion for Summary Judgment is denied. An Order consistent with this Memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CATHERINE E. SHOWELL,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY, et al.** | : | |
| **Defendant** | : | **No. 06-1574** |

**O R D E R**

**AND NOW**, this 10th day of June, 2008, upon consideration of the Defendants' Motion

for Summary Judgment (Docket No. 10), the Plaintiff's response thereto (Docket No. 14),

Defendants' reply brief (Docket No. 21), Defendants' Supplemental Memorandum (Docket No.

23), and Plaintiff's Supplemental Memorandum (Docket No. 24), **IT IS ORDERED** that:

Defendants' Motion for Summary Judgment (Docket No. 10) is **DENIED** without prejudice to

Defendants to raise any included arguments again after all discovery has been completed in the

consolidated case.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge